10 (Pages 34 to 37)

Page 34

1  either SCI or at DCC?
2      A. Certain jobs. And I can't remember the
3  program. But they said something about the Key. They
4  said it would have been -- something that resulted. They
5  didn't want to deal with it. Because when the
6  neurologist said they had something point-some
7  centimeters on the brain or something like that, they
8  basically said -- they felt it might be too stressful or
9  something of that nature.
10     Q. So do you know who specifically told you that
11 you were excluded from those programs?
12     A. One, I think, the people in the Key.
13     Q. In the Key program?
14     A. Mm-hmm.
15     Q. And you mentioned some jobs.
16         Do you know what jobs --
17     A. Maintenance and things of that nature. Now,
18 here they haven't considered me for no jobs, so that's
19 not really an issue.
20     Q. Okay. Did you file any grievances or actions?
21     A. Yeah.
22     Q. And as a result of the disability?
23     A. Yeah. But, then, again, like they said --
24 well, here again, you're asking the same people to do

Page 35

1  what they not going to undue.
2      Q. Did you appeal any of those grievances?
3      A. As high as I could.
4      Q. Okay. And you also mentioned in your
5  complaint that you were served ice cold diet trays.
6      A. Yeah.
7      Q. What do you mean by that?
8      A. Well, in 21 the food is not served by inmates.
9  The food is brought to the cells. And it depends on how
10 long they brought -- it took them to prepare the food in
11 another building, wheeled it on a table to Building 21,
12 then to get the officers to bring it around to the
13 inmates. And so, therefore, the time that you got the
14 food -- if you have french toast, your butter wouldn't
15 melt on the french toast or the pancakes.
16         Sometimes we didn't coffee, because if
17 they short of staff -- and then the officers really
18 didn't want -- we were caught in a Catch-22. Officers
19 didn't want to serve the food. Because like in the MHU,
20 inmates go to eat, which is in the same general housing
21 area. But in the SHU, Building 21, inmates are there in
22 their cells, and certain officers felt that we shouldn't
23 be accorded this luxury, because in Building 21 they had
24 tables and chairs that was stationary, nailed to the

Page 36

1  floor, that they could have fed would us. And they said
2  they didn't understand why the administration put them
3  through this, knowing that they're short-staffed. So we
4  was caught in the Catch-22.
5          I was on a diet. So when the diet left
6  the kitchen, it was hot. But by the time -- it could
7  take 30 minutes to serve us. By the time we get the -- I
8  get the diet, if they had SOS, it was ice cold.
9      Q. And what diet were you on?
10     A. No salt diet, because for blood pressure. And
11 low sodium.
12     Q. Okay. Now, were your meals served in
13 insulated trays?
14     A. No. Trays. All you had to do was pop the
15 lid.
16     Q. Okay. And didn't you at one time work in the
17 kitchen?
18     A. Yep.
19     Q. Okay. Do you remember when that was?
20     A. I worked in the kitchen a total of four years.
21 And it ended about 2004. I was the clerk in the kitchen.
22     Q. Okay. And in your complaint you name a number
23 of defendants. And I'm going to read some of their names
24 that you mentioned. You've named Stanley Taylor, Rick

Page 37

1  Kearney, Thomas Carroll, Mike Deloy, Earl Messick, Joseph
2  Johnson, Anthony Rendina, Paul Howard, Corporal Fisher,
3  Jane Morgan. Are any of these individuals that I've read
4  or anyone that I haven't read -- are you suing any of
5  them based upon your ADA claim, your claim under the
6  Americans for Disabilities Act?
7      A. Tom Carroll was aware because he was the
8  warden here. I had written him. And just they said,
9  when you done the grievance under the ADA -- I carried it
10 as far as I could, and they said it wasn't appliable
11 (phonetic), although I showed them; because when I was in
12 the housing in the Commonwealth of Pennsylvania, I --
13 that was one of the first cases, because they -- some
14 things happened there, but they said I couldn't lift
15 things. They had to detect a certain medical
16 abnormality. And they said that I was disabled to a
17 degree, because that's the first place they discovered
18 that I had degenerative disc disease. And the L4-L5 and
19 a couple other areas was basically a problem.
20         And so they wouldn't -- they made me
21 live on the second floor. And so I told them that that
22 wasn't right, because I used to sometimes get pains going
23 up the steps. And so I carried to court for the United
24 States District Court for the Eastern District of

Page 50

1  Q. Okay. And are you alleging that you have a
2  right to stay at SCI?
3  A. Nope.
4  Q. Okay. Is there any other reason why you
5  believe you should have should have been held or
6  continued to remain at SCI?
7  A. Well, when I applied to come here, they said
8  that there was no room at the inn. They didn't want me.
9  But when they found out that the people from the Justice
10 Department was involved about the health situation,
11 then -- I forget the lawyer that came to see us about the
12 asbestos. And then The News Journal, which was the
13 capper of the caps. And then they said I had outlived my
14 usefulness.
15 Q. Okay. So at one time you had applied to come
16 to DCC?
17 A. Yes. Twice.
18 Q. Okay. Do you remember when that was?
19 A. About 2003. And I think, prior to that, 2002.
20 Somewhere around there.
21 Q. Okay. So when you said in paragraph 41 that
22 Defendants Kearney, Deloy, Messick, Johnson and Fisher
23 are jointly liable because of knowledge of campaign of
24 infringement upon plaintiff's 1st Amendment rights, is

Page 51

1  that related to your transfer?
2  A. Yes.
3  Q. Okay. Now, how is the transfer infringing
4  upon your 1st Amendment rights?
5  A. Well, by -- as a result of me raising certain
6  issues that -- if I don't raise these issues, then
7  basically I would still be at SCI.
8  Q. Okay. And in what ways are you not able to
9  exercise your 1st Amendment rights at DCC?
10 A. Well, they don't basically, in a sense -- able
11 to, as far as they stall about things. But, eventually,
12 it gets done.
13 Q. Okay. Is there any particular examples that
14 you can --
15 A. No.
16 Q. Finally, you allege a medical claim.
17    Are you currently receiving medical
18 treatment?
19 A. Yes.
20 Q. And can you describe specific communications
21 regarding Defendants Taylor and Carroll?
22 A. I made all them aware of what was happening
23 with me, because the buck stops with them. Although they
24 got medical contractors, they are ultimately responsibile

Page 52

1  for what happens to me. And when I basically -- when it
2  started with the MRSA -- there's another word for it, but
3  I don't, you know -- and when they talking about I had
4  spider bites -- there wasn't no spiders, because spiders
5  don't live in air-conditioned environments. And when
6  you're looking like this -- I got this all over my body,
7  legs -- and things of this nature. And they have done
8  nothing.
9     All right. We come most recently -- on
10 November the 8th, they carried me out for EKG. The
11 doctors prescribed medication. This is November the
12 30th, and I haven't seen the medication yet. They -- in
13 the month of -- what is it: November? In October they
14 done an ultrasound on the kidneys. They said they
15 discovered on the right kidney a block -- a spot or
16 something. Nobody has done anything about that.
17    All right. Medication: I take a
18 series, but they have no method where they can know in
19 advance -- if you show them five days before your
20 medication expires, you still may have to wait a month to
21 get the medication that you were prescribed.
22    Dr. Burke told them that I would need
23 additional treatment to deal with this. They have done
24 nothing. Dr. Burke is a dermatologist. The last time I

Page 53

1  seen him, I think, was in May or somewhere around there.
2  They gave me some ointment that they feel that I should
3  have. And here again, like even the doctors, when I -- I
4  had my family contact him about the medication. He could
5  not believe -- and they carried me to a place in Dover
6  called Diagnostic -- Mid-Atlantic or Mid-Delaware
7  Diagnostics. And they the one that done the EKG. And I
8  had my son call them and ask them were they aware or what
9  was the medication.
10    He said ask me hadn't I got the
11 medication. An, here again -- these are not figments of
12 my imagination. Most recently I told the magistrate:
13 Well, why take me to a doctor? Burke is the
14 cardiologist. I said: Why bring these inmates and
15 myself to these places for treatment and then don't give
16 us the treatment that they prescribe? And Burke has said
17 that and also -- most recently being November the 9th.
18    And these are, like I said -- like I
19 understand I'm in jail. And I understand that things
20 will happen. But when you deliberately do things, that's
21 a whole 'nother ball game, because there's no reason that
22 you can justify that, if you take me to a cardiologist --
23 he does the EKG. Then he says he's going to try this
24 medication to see if this medication will help me reduce

Page 94

1  was higher than the other one.
2  Q. You mentioned that you thought that there were
3  nurses doing the jobs of doctors --
4  A. Right.
5  Q. -- nurse practitioners doing the jobs of
6  doctors.
7  A. Not nurse practitioners. Nurse -- like
8  nurses' assistants, because you basically -- like I said,
9  there's only one doctor here. And possibly then you got
10 a language barrier between one of the physicians'
11 assistants, because he's -- he doesn't speak English very
12 clearly. And you got a whole lot of people here who
13 basically have language problems.
14 Q. Well, let's go back now.
15     Is it your brief that nurses are doing
16 the jobs of doctors or physicians' assistants?
17 A. Yeah.
18 Q. Both?
19 A. Both.
20 Q. Okay. Well, what is your understanding of
21 what a nurse should do and what a doctor should do?
22 A. Well, I know a nurse's aid is not supposed --
23 and these are nurses' assistants --
24 Q. Okay.

Page 95

1  A. -- are not supposed to determine -- well, try
2  this. If you go up there and your blood pressure is
3  high, they say, well, give him one of these bills. And
4  this has happened to me. And they say, see if it goes
5  down.
6  Q. Well --
7  A. And this ain't done by a doctor.
8  Q. So a nurse assistant is giving you medication?
9  A. Yeah.
10 Q. Do you know the names of any of these nurse
11 assistants?
12 A. No. They don't wear no badges because they
13 don't want nobody to know their names.
14 Q. Okay. How do you know they're nurse
15 assistants?
16 A. Because I've asked a couple of them
17 indirectly. And I've had other people tell me what they
18 were.
19 Q. How do you know, then, if a doctor is treating
20 you or a physician assistant or a nurse?
21 A. Because when you go to the doctor, you go in
22 there to him.
23 Q. He has his own office?
24 A. Yes.

Page 96

1  Q. Okay.
2  A. Other people you see them in the general area.
3  They will take you off to the side in the waiting room
4  and tell you this, this, this. Because when you go to
5  see the doctor, really it's a very serious situation,
6  because like people --
7  Q. Oh, I'm sorry.
8  A. -- people -- a couple case where I know they
9  only got ready to see the doctor when they fell out.
10 Q. Does a physician assistant -- have they ever
11 prescribed medication for you?
12 A. Yeah. In fact, the one that prescribed the
13 sulfur-based medication --
14 Q. Okay.
15 A. -- and the one that said I was suffering from
16 spider bites.
17 Q. Was a physician assistant?
18 A. Yeah.
19 Q. Do you know who that was?
20 A. Crystal -- I forget her last name. Crystal
21 Austin.
22 Q. Now, at the end of your complaint, there are,
23 I guess, seven enumerated items, it appears, that you're
24 seeking as a result of this lawsuit.

Page 97

1  A. Mm-hmm.
2  Q. The first one is: Court preliminarily and
3  permanently enjoin defendants, their agents and employees
4  from denying plaintiff medical attention and directs the
5  defendants to make accommodation for plaintiff's physical
6  abilities. Is that accurate?
7  A. Yes.
8  Q. Okay. Preliminarily and permanently require
9  defendants to provide scheduled medical appointments with
10 Dr. David Sopa.
11 A. Yeah. That was the one that was treating me
12 for the elbow operation or things. This was when I was
13 at Georgetown. He had prescribed things that they had
14 never done.
15 Q. What did he prescribe that was never done?
16 A. Follow-up as far as on the operation on the
17 elbow. And constantly like I have pain in it. But I
18 don't even bother to complain about it because they
19 say -- when you complain about pain, they want to give
20 you Motrin. And I don't want Motrin because I was told
21 Motrin over a long period of time does harmful things to
22 the stomach.
23 Q. Okay. So let me make sure I understand this
24 correctly. You've had pain in your elbow --